IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2000 Session

## STATE OF TENNESSEE v. MICHAEL WAYNE PERRY

**Direct Appeal from the Criminal Court for Wilson County**
**No. 97-1173 - 1173A     J. O. Bond, Judge**

---

**No. M1999-01832-CCA-R3-CD - Filed April 6, 2001**

---

The defendant, Michael Wayne Perry, was convicted by a Wilson County jury of second degree murder and first degree felony murder committed during the perpetration of, or attempted perpetration of, rape. The trial court sentenced Defendant to life without parole for the first degree murder conviction, twenty years as a standard Range I offender for the second degree murder conviction, and then merged the two counts into a single conviction for first degree murder. Defendant appeals his convictions and presents the following issues: 1) whether the trial court erred in admitting Defendant's recorded confession; 2) whether the trial court erred in admitting evidence obtained from the vehicle that Defendant drove on the night of the murder; 3) whether the trial court erred in admitting photographs of the victim's body; 4) whether the trial court's instructions to the jury were proper; 5) whether the evidence was sufficient for a rational trier of fact to find Defendant guilty beyond a reasonable doubt; and 6) whether the conduct of law enforcement officials in the case "shocks the conscience." Based upon a careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID H. WELLES, JJ., joined.

John B. Nisbet, III, Cookeville, Tennessee; Comer L. Donnell, District Public Defender; and Karen Chaffin, Assistant District Public Defender, for the appellant, Michael Wayne Perry.

Paul G. Summers, Attorney General and Reporter; Russell S. Baldwin, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; Robert N. Hibbett, Assistant District Attorney General; and David Durham, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# FACTS

On the evening of April 8, 1997, at approximately 11:00 p.m., twenty-four-year-old Michael Wayne Perry, the defendant, was seen leaving the Cactus Moon Bar in Lebanon, Tennessee, with the victim, thirty-two-year-old Cynthia Louise Hamilton Boyle, in a Chevrolet Blazer driven by Defendant and owned by Defendant's father-in-law. The victim's naked and battered body, with a visible tire track across the right shoulder, was found the next morning at the golf course of the Lebanon Country Club. The autopsy showed that she had suffered multiple injuries, including the fracture of all twelve ribs on the left side of her body, multiple perforations of the lungs, fractures of the left arm and leg, a subdural hematoma, and various abrasions and contusions of the face and body. Four of her teeth had been knocked out. A severe laceration to her left ear was consistent with the victim having been struck by a hard object. Abrasions on her face and body indicated that she was not only run over by a vehicle, but also dragged beneath it for some distance.

On April 15, 1997, Defendant was arrested and taken to the Lebanon Police Department for questioning. At approximately 7:04 p.m., Lebanon Police Detective Tommy Burns read Defendant his rights, and Defendant signed a waiver of rights form. Detective Burns was then joined by Lebanon Police Detective Bob Harrison, and they questioned Defendant about his activities on the night of the murder. Approximately forty-five minutes into the interview, when the detectives asked about his son's schoolwork that had been found at the murder scene, Defendant said, "I have no more further, I have nothing further to say. Y'all [sic] got something on me, I want to get me a lawyer. But there's nothing on me 'cause I can prove my son does not write or nothing. My son can't write; he can't even talk." (A dispute later arose between Defendant and the State concerning the actual language used by Defendant. After listening to the tape of the interview, the trial court ruled that Defendant made the statement quoted above.) The detectives continued questioning Defendant for another nine minutes, concluding the interview at 8:00 p.m.

Detectives Burns and Harrison interviewed Defendant once more that same evening, from 9:02 p.m. until 9:44 p.m., and again the next day, from 3:00 p.m. until 3:39 p.m. Defendant was informed of his rights at the beginning of each interview and signed another waiver of rights form before the third interview commenced. During the third interview, Defendant admitted leaving the bar with the victim. He further stated that he and the victim had been driving around in his father-in-law's Blazer when, suddenly, the victim started "going off in the head." She hit him several times with her hand before jumping out of the truck and falling under its wheels. He stopped and picked her up, put her back in the truck, and then dumped her body on the golf course. Defendant said that he did not remember whether or not he had raped her, but that he "might have" beaten the victim and it was "possible" that he had been trying to have sex with her. About one hour after the conclusion of the interview, at 4:50 p.m. on April 16, 1997, Defendant was served with a warrant charging him with first degree murder for the death of the victim.

According to Detective Burns, the next morning, April 17, 1997, Defendant asked to talk with him again. When Burns met with Defendant in an interview room of the jail, Defendant asked to be left alone with a tape recorder in order to make a statement. Burns read Defendant his rights,

and Defendant signed another waiver of rights form. Burns then left the room, and Defendant recorded a statement in which he confessed to killing the victim after she refused his request for sexual intercourse. Defendant said that the victim's refusal had made him "frustrated, real frustrated," and that "all evil inside or something came out." He admitted beating the victim "bad," before throwing her out of his truck and deliberately running her over. He also stated that, before he threw the victim out of the truck, he "did stuff" to her and thought he had raped her.

## Suppression Hearing

Defendant later moved to suppress all of his statements to the police on the grounds that they had been taken in violation of his right to counsel and were not freely and voluntarily given. At the July 12, 1999 suppression hearing, Detective Burns testified that Defendant had been informed of his rights before each interview and that Defendant had claimed that he understood those rights. Defendant did not appear to be under the influence of drugs or alcohol at any time during the interviews, and he never gave any indication that his statements were not voluntary. Burns stated that Defendant signed a waiver of rights form before his first and third interviews and, again, before his fourth statement on April 17 wherein he recorded his confession. Three waiver of rights forms, dated April 15, 1997 at 7:05 p.m., April 16, 1997 at 3:01 p.m., and April 17, 1997 at 9:25 a.m., respectively, and each containing Defendant's signature were introduced into evidence.

Burns testified that on April 17, 1997, he received word from the jail that Defendant wanted to talk with him again. He then met with Defendant in the interview room at the jail. Once there, Defendant told Burns that he could not look at Burns' face while talking and asked if he could be left alone to tape-record his statement. Burns complied, stepping outside the room to watch through the room's glass wall as Defendant, alone and uninterrupted, tape-recorded his confession.

On cross-examination, Burns testified that the first two interviews with Defendant on April 15 were conducted at the police department. Then Defendant was taken to the jail where subsequent interviews were held. Burns could not remember whether someone from the jail had telephoned him on April 17 to tell him that Defendant wanted to talk with him, or whether he had merely arrived at the jail and was informed then. During Defendant's stay at the jail, he was placed in one of the "holding cells." Burns acknowledged that Defendant had asked him "one time" to get him out of "that little room." It is unclear from the transcript, however, whether Burns was referring to the holding cell or the interview room. Burns testified that Defendant never asked Burns to get him a lawyer. Further, he did not recall whether he or Detective Harrison had discussed the death penalty with Defendant.

Detective Bob Harrison testified that, at the end of the third interview, Defendant asked what was going to happen to him. Harrison told him that the crime may be considered a capital offense. Defendant asked what a "capital offense" meant, and Harrison explained that it was one which could carry the death penalty. Harrison denied threatening Defendant or making any promises to induce him to talk. Harrison was not present at the fourth interview because Defendant had expressed a dislike for him and preferred to talk to Detective Burns alone. According to his recollection, after

Burns was notified that Defendant wanted to talk to him on April 17, he "grabbed up his equipment and started out" to meet him.

Defendant presented the testimony of a police officer who stated that the size of the room in which Defendant had been held at the jail was four feet by eight feet. The officer admitted, however, that he had never measured the room. Another officer in the courtroom informed the judge that the room was twelve by eight. The record did not contain any other factual proof of the room's exact dimensions.

Defendant testified that he did not call Detective Burns to come over to the jail to talk to him on April 17. Defendant also claimed that he had wanted to use the phone but was not allowed phone privileges. He denied that he had asked anyone to contact Detective Burns on his behalf, claiming instead that Burns had "just showed up down there."

On July 22, 1999, the trial court ruled on Defendant's suppression motion. The court found that Defendant's words, "Ya'll got something on me, I want to get me a lawyer," had been a request for an attorney and that the detectives should have ceased questioning him at that point. Consequently, the trial court suppressed the portion of the first interview that occurred after his request. However, the court declined to suppress the subsequent interviews, finding that Defendant had had time between the interviews to "have hired a lawyer or called his lawyer," that the officers had advised him of his rights at each subsequent interview, and that he had not asserted his right to remain silent or reasserted his right to an attorney. The court further found that the "officer was probably through with [Defendant]" after the third interview and that the proof showed "by a preponderance of the evidence" that Defendant had requested the fourth meeting with Detective Burns during which he tape-recorded his confession.

**Trial**

At Defendant's trial, the State presented several witnesses who testified that Defendant and the victim left the Cactus Moon Bar together on the evening of April 8, 1997. Rhonda Brymer, whose mother and stepfather had owned the bar, testified that she worked there when the incident took place in 1997 and met the victim a few months before she was murdered. On the evening of April 8, 1997, Brymer observed the victim and Defendant talking together in the bar. Defendant had a beer in his hand, and she did not recall whether he drank more than that. At about 11:00 p.m., Brymer saw Defendant and the victim walk out of the bar together and get into a Chevrolet Blazer. She identified a photograph of the vehicle, which was then introduced into evidence.

On cross-examination, Brymer testified that the victim and her fiancé, Albert Branham, had gone through a breakup approximately one week before the murder. Brymer further stated that the victim would go home with anybody that might provide her with a place to stay and admitted to receiving a $350 reward for turning Defendant in.

-4-

James Gann, a convicted felon and Brymer's ex-boyfriend, testified that he noticed Defendant and the victim sitting together in the bar on April 8, 1997. As Defendant left, he "hollered and told [the victim] to come on" as he held the door open. Defendant then "kind of guided her out and he went out behind her." Several days later, Defendant showed up at the bar on a bicycle and Gann told him to bring the bicycle inside. Meanwhile, Gann winked at Brymer to indicate that she should call the police, but Defendant must have seen the wink because he "grabbed his bicycle and run back out the door." Gann gave chase, but was unable to catch him.

On cross-examination, Gann admitted that at the time of trial he was serving time for forgery. He further testified that Albert Branham, the victim's boyfriend, had been in the bar on the evening of April 8 and appeared to be upset that the victim was paying attention to Defendant. Immediately after the murder, Gann told an investigator that he had an "instinctive feeling" that Branham killed the victim. Gann denied that he told someone from the public defender's office that he had bought Defendant four or five beers that evening. Instead, he testified that he bought the victim a couple of beers, but only bought one for Defendant.

Dorothy Locke, Rhonda Brymer's mother, testified that the victim had done odd jobs for her, both at the Cactus Moon Bar and at her home. Locke testified that she believed the victim was "pretty much homeless" and that she became "really homeless" after she and her fiancé broke up. Locke observed the victim talking to Defendant in the bar on the night she was killed and overheard her ask Defendant for a ride. She also heard Defendant mention that his house had purple shutters. Defendant did not appear to be intoxicated at the time.

After the murder, Mrs. Locke and her husband drove around town until they located Defendant's house. She then called her daughter who called the police. During cross-examination, Locke admitted that her daughter received a $350 reward and shared it with her. She also testified that the victim had been observed leaving the bar with different men on more than one occasion.

David Locke, Dorothy Locke's husband, testified that Defendant occasionally patronized the bar. On the evening of April 8, 1997, Defendant entered the bar but did not purchase anything. Later, Locke observed Defendant with a beer and assumed that someone bought it for him. At about 10:30 p.m., he noticed the victim and Defendant leave the bar together in a Chevrolet Blazer. David confirmed that the victim had been seen leaving the bar with other men on various occasions in the past.

Terry Bowman, Commander of the Special Operations Division of the Lebanon Police Department, testified that when he arrived at the Lebanon Country Club golf course at about 10:00 a.m. on April 9, 1997, the victim's body was lying on the ground beside a large cedar tree. At trial, Bowman identified six photographs which accurately depicted the murder scene as it appeared that day. One photograph of the victim's naked body showed that her clothes appeared to have been forcibly removed. Part of her clothing, a blouse and bra, seemed to be entangled around one of her arms and a leg. Other photographs showed the victim's purse and its scattered contents, the

condition of her clothing, and a "kindergarten type drawing . . . of a turtle" with the name "Michael" written in childish block letters at the top.

Mary Day Reynolds, special education teacher at Beech Elementary School in Hendersonville, testified that Defendant's young son, Michael, was enrolled in her special education preschool class in 1997. Reynolds identified the turtle-drawing as the type of work she would assign the class to do under the supervision of her teacher's aide, Kaye Barton, who later confirmed that the drawing was the work of Defendant's son.

Detective Robert Harrison, with the Lebanon Police Department, testified that he and Detective Burns had conducted interviews of Defendant. Harrison identified the consent form that Defendant signed on April 15, 1997, allowing Defendant's blood to be drawn as part of a "sexual assault collection kit." The blood sample was collected by medical staff at the University Medical Center Hospital, and then sent to the Tennessee Bureau of Investigation Crime Laboratory for analysis.

During cross-examination, Harrison testified that the victim had lived in Lebanon "off and on over a period of perhaps several years," that she had an ex-husband in Lebanon, and that she had been married several times. The victim had been "a regular" at the bar, coming into frequent contact with several men whom Harrison was familiar with through his work in law enforcement, including James Gann and Albert Branham. Harrison discovered that the victim had often left the bar with different men.

Harrison further testified that the first two interviews of Defendant were conducted at the Lebanon Police Department. The third interview took place in the judicial commissioner's office, "a small room . . . in the county jail" about "five or six [feet] by eight [or] ten[,] somewhere in that area[.]" The room contained a desk, three chairs, and a breath alcohol machine. Harrison admitted that, although he did not find the room uncomfortable, it was "pretty close." Harrison did not know where Defendant had been housed while at the jail, but said that the usual practice for detaining individuals held for investigative purposes was to keep them in holding cells in the front of the jail, separate from the rest of the jail population. When the third interview was conducted, Defendant had been in custody for less than twenty-four hours.

Harrison testified that he had received training in interrogation techniques. In one such technique, an officer will "start using phrases over and over again and the suspect starts to use those same phrases." Harrison admitted that, towards the end of the third interview, he had stopped asking questions and began to tell Defendant what he thought had happened, based on the evidence. When asked whether he had noticed that Defendant's fourth statement contained some of the same expressions used by Harrison during the third interview, Harrison answered in the affirmative but stated that he had also noticed that there were "other things in the final statement" that neither he, nor anyone else, had mentioned.

Detective Burns, with the Lebanon Police Department, testified that he participated in the interviews with Defendant. Burns said that the fourth interview had not been planned, but as soon as he received word that Defendant wanted to see him, he went to the jail. Defendant then told Burns that, when he closed his eyes, he saw the victim's face and was unable to sleep. Defendant made it clear to Burns that he would rather talk into a tape recorder than talk with Burns. Burns had not conducted an interview in this manner before, but did not foresee a problem with it. So, after Burns read Defendant his <u>Miranda</u> rights and Defendant signed a waiver of rights form, Burns left him alone to tape-record the following statement, which was played for the jury during trial:

> I, Michael Perry, on the 8th or 9th was down at a bar just hanging out and drinking beer been drinking beer all afternoon. I met I can't remember her name, short haired lady, and we was talking and decided to leave together. We were taking a few more beers, a couple of valiums, just riding around. I was asking her for give me sex and she was telling me 'no'. She wanted, she was on her period. [Inaudible] started getting frustrated, real frustrated. I don't know what was coming over me but just all evil inside or something came out. She sat down at the door of the truck, the truck was going I guess forty-five (45) miles an hour. She jumped out, I went, turned around and came back put her back in the truck, drove up to I guess it was the golf course, pulled down in behind a tree. I beat her. I beat her. I beat her bad with my fist, my elbows. I throwed her out of the truck. [Inaudible] before I threw her out of the truck, I did stuff, [inaudible]. I'm not sure if I did, I think I raped her. I know I beat her. I beat that poor woman so bad. My mind is so screwed up but I threw her out of the truck, I got out, hit her and I think I kicked her in the face a couple of times. I got back in the truck and I went up and around and I come back down and I had the truck floored and I ran over her again and I went straight home. I didn't, I didn't know what come over me. I didn't. As God is my witness I did not know what come over me. [Inaudible]. Ain't nobody should be done that way. [Inaudible].

On cross-examination Burns testified that, during the third interview, "[Defendant] made statements like, if I did run over her I was too drunk to have known it [.]" Defendant also admitted that he did not recall "if [he had] raped her or beat her or anything like that." Burns acknowledged that no semen had been discovered and that Defendant had asked him, at the beginning of the third interview, to get him out of "that little room." Burns conceded that the room in which Defendant was held at the jail had no window or bed. However, Defendant had been provided with a mattress and a blanket which could be placed on a metal rack mounted on the wall. Burns admitted that Defendant had been denied contact with his family and that a hold had been placed on his telephone calls until after he was charged.

Special Agent Linda Littlejohn, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she was a member of the violent crime response team assigned to investigate the homicide that occurred at Lebanon Country Club Golf Course. The team discovered tire tracks found near the victim's body that were consistent with those left by the tires on the Chevrolet Blazer owned by Defendant's father-in-law. In addition, the buttons found on the ground nearby were consistent with buttons from the victim's blouse. Inside the vehicle, on the back floorboard, investigators found a wrench and three human teeth. Hair was also collected from the undercarriage of the vehicle. Littlejohn explained that DNA analysis had not been performed on the hair because the TBI crime lab does not have an examiner who performs hair comparisons. Hair samples must be sent to the Federal Bureau of Investigation crime laboratory which will not process hair samples unless the DNA testing on other evidence proved inconclusive. Since TBI was able to obtain DNA results from the blood found in the vehicle, the hair was never analyzed.

On cross-examination, Agent Littlejohn acknowledged that without DNA analysis, she could not testify as to the identity of the hair samples and she had no knowledge regarding whether fingerprint comparisons had been performed. Littlejohn further admitted that the tire tracks found at the murder scene could have been left by a vehicle with tires similar to those on the Blazer, and the tire tracks on the victim's body contained insufficient detail to determine the number of times the victim was run over.

Special Agent Joe Minor, a forensic scientist with the TBI, testified as an expert in serology and DNA analysis. Minor conducted DNA analysis on blood samples recovered from the passenger area of the Blazer, two wrenches found inside the vehicle, and Defendant's blue jeans. The blood on the jeans, the rear passenger seat, and one wrench found under the driver's seat matched the DNA profile of the victim's blood. Minor said that the probability that someone else would have the same DNA profile was 1 in 1,670 for the Caucasian population, and 1 in 4,830 for the Black population. Minor was unable to obtain a result from blood found on the second wrench, due to an insufficient amount of high molecular weight DNA recovered in that sample.

On cross-examination, Minor acknowledged that the blood could have come from someone other than the victim who shared the same DNA profile. He admitted that he had not found any sperm or semen but stated, on redirect, that he would not expect to find sperm or semen if a condom had been used or if ejaculation had not occurred and no pre-ejaculate had been emitted.

Dr. Charles Warren Harlan, the physician who performed the autopsy on the victim's body, testified that the cause of death was multiple injuries. Using five photographs of the body, Dr. Harlan pointed out tire tread marks on the right chest and shoulder of the victim, the fracture and dislocation of the left leg, fractures of the left upper arm, various lacerations and contusions of the body, and multiple linear abrasions on the chest and abdomen which were consistent with drag wounds. Dr. Harlan stated that the victim had suffered multiple perforations of the lungs and a subdural hematoma (an area of blood accumulation on the brain). Photographs of the victim's face showed an area of her mouth where four of her teeth had been knocked out. A view of the left side

of the face revealed a laceration of her ear, which Dr. Harlan opined could have been caused by a blow from the wrench found in the Blazer. All of the victim's injuries occurred prior to her death.

On cross-examination, Dr. Harlan stated that the main cause of death was "being run over" and that the victim's body appeared to have been dragged by a vehicle. He conceded that some, but not all, of the victim's injuries could have occurred as the result of the victim jumping or falling out of the vehicle. The victim's blood alcohol level was .22.

At the conclusion of the State's evidence, Defendant moved for a judgment of acquittal which the trial court denied. Following jury deliberations, Defendant was found guilty of one count of first degree felony murder and one count of second degree murder. Defendant waived a sentencing hearing for the first degree murder conviction, and the trial court imposed a sentence of life without parole. The court sentenced Defendant to twenty years as a standard Range I offender for the second degree murder conviction and then merged both counts into one conviction for first degree murder.

## ANALYSIS

### I. Admissibility of Confession

Defendant argues that the trial court erred in admitting his confession into evidence at trial. He contends that the evidence presented at the suppression hearing showed that Detective Burns improperly initiated the contact which led to his confession and that his confession was not freely and voluntarily made. Asserting that he suffers from claustrophobia, Defendant claims that he was coerced into making the confession by his desire to escape the small, hot, interview room and the small, uncomfortable holding cell in which he was housed while at the jail. The State argues that the trial court did not err in finding that Defendant initiated the contact which led to the fourth interview, and that the evidence supports a finding that Defendant freely and voluntarily tape-recorded the statement after a valid and knowing waiver of his rights.

A trial court's findings of fact in a suppression hearing are entitled to a presumption of correctness and will not be overturned on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986). The trial court's determination at a suppression hearing that a confession was voluntary is presumptively correct on appeal. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's application of law to the facts, however, is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. See U.S. Const. Amend. V; Tenn. Const. art. I § 9. To be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made, after Defendant's knowing waiver of his constitutional right to remain silent, or to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S.

436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). When a suspect makes an unequivocal request for an attorney, all interrogation must cease, unless the suspect himself initiates further conversation with the police. See Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85, 68 L. Ed. 2d 378 (1981); State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994). An invocation of the right to counsel "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Davis v. United States, 512 U.S. 452, 459 114 S. Ct. 2350, 2355, 129 L. Ed. 2d 362 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209, 115 L. Ed. 2d 158 (1991)).

We agree with the trial court that Defendant invoked his right to counsel during the first interview. Therefore, before Defendant's confession could be admitted at trial, the burden was upon the State to show both that Defendant initiated the conversation which led to his confession, and that he made a knowing and intelligent waiver of his right to counsel. Id.; Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 2834, 77 L. Ed. 2d 405 (1983). "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights." Edwards, 451 U.S. at 484, 101 S. Ct. at 1884-85.

The trial court found that the evidence presented at the suppression hearing showed the detectives had concluded their interviews with Defendant on April 16 and that Defendant had requested the April 17 meeting with Detective Burns which led to his confession. The court further found that Defendant had been informed of his Miranda rights and had signed another waiver of rights form before he was left alone to tape-record his confession, which he was then allowed to do without interruption or further questioning by the detective. Thus, the court concluded that the requirements for admitting the confession into evidence had been satisfied.

The evidence does not preponderate against the trial court's finding. Although Defendant stated during the suppression hearing that he had "asked nobody nothing," both Detective Burns and Detective Harrison testified that Detective Burns had met with Defendant on April 17 solely because someone from the jail had informed Burns that Defendant wanted to see him. The trial court is in the best position to determine the credibility of witnesses, and we attribute great weight to the trial court's determinations. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Defendant does not dispute that he was left alone to make his statement or that he signed a waiver of rights prior to taping the confession. The only evidence Defendant points to in support of his argument that the confession was coerced are his remarks, made during the second and third interviews, about the "hot, little" interview room, and Detective Harrison's statement to him, at the conclusion of the third interview, that he needed "to think about what's going to happen" because "this is a serious offense [and] could be considered a capital offense." However, the fact that Defendant was uncomfortable at the jail and/or in the interrogation room and Detective Harrison's comments regarding the seriousness of the offense are not sufficient in themselves to show that his confession was the product of police coercion. We conclude, therefore, that the trial court did not err in allowing Defendant's confession to be admitted into evidence at trial. Defendant is not entitled to relief on this issue.

-10-

## II. Admissibility of Evidence from Defendant's Vehicle

Defendant argues that the trial court erred by allowing evidence seized from a Chevrolet Blazer, the vehicle he was driving at the time of the crime, to be admitted into evidence at trial. Citing the "fruit of the poisonous tree" doctrine, Defendant asserts that evidence recovered from the Blazer should have been suppressed because the detectives gained information about the vehicle's location from him during their continued questioning after he had asserted his right to an attorney.

The State cites both the "independent source" and "inevitable discovery" doctrines and argues that the evidence discovered in the Blazer was properly admitted at trial. The State points to the fact that the detectives had learned Defendant was driving the Blazer on the night of the murder and that Defendant had returned the vehicle to its owner, his father-in-law, prior to his request for an attorney. The State further asserts that the only unique information Defendant provided subsequent to his request for an attorney was the exact location of his father-in-law's house, information which could, and would, have been inevitably discovered later through independent sources.

The Tennessee Supreme Court, concerning this issue, recently held

> that a *per se* exclusionary rule, which would automatically exclude non-testimonial evidence obtained from a technical failure to give <u>Miranda</u> warnings, is not warranted. Instead, we hold that a defendant may seek suppression of non-testimonial evidence discovered through his or her unwarned statements *only when the statements are the product of an actual violation of the privilege against self-incrimination*, i.e., such as when actual coercion in obtaining the statement is involved, or when the invocation of the right to remain silent *or to have counsel present* is not "scrupulously honored." <u>Cf.</u> <u>State v. Crump</u>, 834 S.W.2d 265, 270 (Tenn. 1992) (holding that a refusal to honor the right to remain silent, "by definition, is of constitutional magnitude").

<u>State v. Timothy Walton</u>, ___ S.W.3d ___, No. W1998-00329-SC-R11-CD, slip op. at 16 (Tenn. Mar. 15, 2001) (emphasis added).

Ordinarily, evidence obtained through the violation of a suspect's constitutional rights must be excluded at trial. <u>See</u>, <u>e.g.</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471, 485, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963); <u>Mapp v. Ohio</u>, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385, 392, 40 S. Ct. 182, 183, 64 L. Ed. 319 (1920). When, however, the prosecution can show either that the police had an independent, untainted source for the information leading to the contested evidence, or that the evidence would have been inevitably discovered through routine police investigation, an exception to the general rule of exclusion exists. <u>See</u> <u>Nix v. Williams</u>, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

Here, the record reveals that Defendant informed the detectives very early in the first interview that he had been driving his father-in-law's vehicle on the night of the murder. Later, in that same interview but prior to his request for an attorney, Defendant also told the detectives that he had already returned the vehicle. In response to their questioning, he then described the vehicle in exacting detail. The only new information that Defendant provided the detectives subsequent to his request for an attorney was the exact location of his father-in-law's house. We agree with the State that this type of information would have been easily and inevitably discovered through routine police investigation, e.g., during an interview with Defendant's wife or a search of public or police records. Therefore, we conclude that the evidence seized from the Blazer was properly admitted at trial. Defendant is not entitled to relief on this issue.

### III. Admissibility of Photographs of Victim's Body

Defendant argues that the trial court erred by allowing photographs of the victim's body to be admitted into evidence. Defendant objects to the introduction of three photographs of the crime scene, introduced into evidence through the testimony of Commander Bowman, and five photographs of the victim's body, including autopsy photographs, which Dr. Harlan referred to during his testimony. Defendant asserts that the prejudicial effect of these photographs, which he characterizes as "gory" and "gruesome," outweighed their probative value. Defendant further contends that the photographs of the crime scene were introduced primarily to inflame the jury's passions and that Dr. Harlan could have adequately described the victim's injuries without showing gruesome crime scene and autopsy photographs to the jury.

Under Tennessee Rule of Evidence 403, relevant evidence may be excluded if the trial court finds that its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The admissibility of photographs generally lies within the sound discretion of the trial court, and will not be overturned on appeal absent a showing that the trial court abused its discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000), cert. denied, 121 S.Ct. 786 (Jan. 8, 2001) (citing Banks, 564 S.W.2d at 949)).

The photographs introduced through Commander Bowman present three different views of the crime scene. One photograph provides a distant view of the victim's body. Another is a view of the victim's left leg and lower garments. Neither of these photographs is particularly gruesome. In the third photograph, the entire body is in focus, showing some bruising and blood about the face and a small amount of blood on the shoulder. This photograph also clearly shows the condition of the victim's clothing. During the presentation of the photograph to the jury, Commander Bowman described the state in which the victim had been found:

> The clothing here, as you can see, this is the pants and boots of the
> victim. One boot is stuck in the other leg of the pants here, the other

boot is still on, apparently had been pulled away from the victim, I would say without her cooperation. Up here is also part of her clothing, this is her upper clothing, blouse. I believe there was [a] vest of some type, her bra I think, was also attached to her arm right here.

Throughout the trial, Defendant suggested that the victim, whom witnesses had frequently seen leave the bar with different men, had voluntarily removed her clothes to engage in some sort of consensual sexual activity with Defendant. Consequently, photographs showing what appeared to be the victim's clothing torn from her body were relevant to the issue of whether Defendant had raped or attempted to rape the victim during the commission of the murder. We conclude, therefore, that any prejudicial effect the photographs may have had was outweighed by the probative value.

Defendant also objects to the admission into evidence of five photographs of the victim's body, including several autopsy photographs, which were utilized by the medical examiner during his testimony. He contends that Dr. Harlan could have adequately apprized the jury of the victim's injuries without resorting to gruesome photographs that were likely to inflame the jury's passion and prejudice them against Defendant.

As a general rule, where medical testimony is sufficient to adequately describe a victim's injuries, gruesome and graphic photographs should not be shown to the jury. State v. Morris, 24 S.W.3d at 811 (citing State v. Duncan, 698 S.W.2d 63 (Tenn. 1985)). There are some instances, however, in which photographs may serve as the best method by which the nature and extent of the victim's injuries can be conveyed to the jury. Id. In this case, the trial court held a jury-out hearing to determine the admissibility of these photographs prior to their presentation to the jury. During that hearing, the medical examiner explained which photographs he intended to use and what each photograph would demonstrate. The photographs of the victim's body showed the tire tracks across her shoulder and torso, and the fractures of her arm and leg. The autopsy photographs of the victim's head revealed the gaps where four of her teeth had been knocked out, and the laceration of her ear which was "consistent with a blow from a firm, hard object." At the conclusion of the hearing, the trial court ruled that the photographs chosen by the doctor were admissible, finding them to be the "best evidence" with which Dr. Harlan could show the jury his findings regarding the victim's injuries and illustrate the cause of death.

After careful review, we cannot conclude that the trial court committed reversible error in allowing the photographs, including the autopsy photographs, into evidence. Although the photographs are unpleasant, they are not especially gruesome or gory. Since the defense attempted to establish that the injuries could have been caused by the victim jumping or falling under the vehicle, the photographs were relevant to show not only the nature and extent of the victim's injuries but those which, in the opinion of the medical examiner, had not been caused by being run over but by blows to the head. We conclude, therefore, that the trial court did not err in allowing the photographs of the victim's body to be admitted into evidence. Defendant is not entitled to relief on this issue.

## IV. Jury Instructions

### A. Instructions on Felony Murder and Intoxication

Defendant argues that the trial court erred by failing to give proper jury instructions on felony murder and intoxication. He first argues that the felony murder conviction must be overturned because the trial court failed to charge the jury that the killing was "closely connected to the alleged attempted rape and not a separate, distinct, and independent event," failed to properly instruct the jury that Defendant used force or coercion to accomplish the act, and failed to correctly charge the jury concerning attempt. Defendant also argues that the trial court committed reversible error when it omitted the word "generally" in its instruction to the jury that should have been stated, "intoxication itself is generally not a defense to prosecution for an offense."

In response, the State argues that Defendant waived the issue by failing to object at trial to the alleged omissions in the jury instructions. Further, the State argues that error, if any, was harmless. The State concedes that the trial court did not use the language contained within the pattern jury instructions to instruct the jury that felony murder required the killing be "closely connected" to the attempted rape or rape, but contends that the trial court conveyed the same meaning when it instructed the jury that, to find Defendant guilty of felony murder, the killing had to be "committed . . . *during* Defendant's attempt to commit the criminal offense of rape[.]" (emphasis added).

The State also recognizes that the trial court failed to instruct the jury on the legal definition of attempt, but contends that the error was harmless because the general public's understanding of "attempt" is not different from the legal definition. The State notes that the trial court instructed the jury that, to find Defendant guilty of felony murder, it must find that the "killing was committed by the defendant during the defendant's attempt to commit the criminal offense of rape . . ." and the trial court then instructed the jury on the elements of rape.

The State argues that the trial court's omission of the word "generally" in its instruction to the jury that "intoxication [generally] is not a defense to murder" was not error. Tennessee Code Annotated section 39-11-503 expressly states that "intoxication itself is not a defense to prosecution for an offense." Tenn. Code Ann. § 39-11-503(a) (1997). An exception exists when the intoxication is involuntary "if, as a result of the involuntary intoxication, the person lacked substantial capacity either to appreciate the wrongfulness of [his] conduct or to conform . . . to the requirements of the law." Id. § 39-11-503(c). However, there was no evidence in the record that Defendant's alleged intoxication was involuntary. The State further notes that the trial court provided a full and detailed instruction on voluntary intoxication in its charge to the jury.

In reviewing this issue, we are mindful that jury instructions given at trial should not be measured against a "standard of perfection." City of Johnson City v. Outdoor West, Inc., 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996), perm. app. denied (Tenn. 1997) (citing Grissom v. Metropolitan Gov't of Nashville, 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991)). Moreover, "'jurors

do not sit in solitary isolation booths parsing instructions for subtle shades of meaning'" but instead may be presumed to utilize "'commonsense understanding of the instructions[.]'" State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998), cert. denied, 526 U.S. 1071, 119 S. Ct. 1467, 143 L. Ed. 2d 551 (1999) (quoting Boyde v. California, 494 U.S. 370, 380-81, 110 S. Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990)). Therefore, we review each jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. See State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997), cert. denied, 524 U.S. 941, 118 S. Ct. 2348, 141 L. Ed. 2d 718 (1998); Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 446 (Tenn. 1992).

We agree with the State that, although the trial court failed to use the language of the pattern jury instruction regarding the proximity of time between the rape or attempted rape and the murder, the same meaning was conveyed by the judge's instruction that the murder had to have occurred "during" the rape or attempted rape of the victim. In addition, we find that the trial court's instruction regarding the second element of the offense of rape, i.e., that the State must prove that "the defendant used force or coercion *against the alleged victim*" rather than "*to accomplish the act*" as stated in Tenn. Code Ann. § 39-13-503, if erroneous, is harmless error. We also agree with the State that the trial court's failure to include an instruction on attempt, and to include the word "generally" within the instruction that "intoxication is generally not a defense to a crime," if error, was harmless error. See Vann, 976 S.W.2d at 101 (stating that a charge should be considered "prejudicially erroneous" if it "fails fairly to submit the legal issues or if it misleads the jury as to the applicable law").

## B.  Instructions on Lesser-Included Offenses

Defendant also argues that the trial court erred by failing to provide jury instructions pursuant to State v. Burns, 6 S.W.3d 453 (Tenn. 1999), on lesser-included offenses to both felony murder and second degree murder. Defendant asserts that the trial court should have included instructions on voluntary manslaughter, aggravated assault, assault, and vehicular homicide. The State argues that the trial court's failure to instruct the jury on these offenses does not constitute reversible error.

The record in this case reveals that, prior to issuing its instructions to the jury, the trial court discussed with both the prosecution and the defense the lesser-included offenses it was going to charge. The record further reveals that the only protest offered was on the part of the prosecutor, who initially objected to the order in which the court proposed to charge the lesser-included offenses. When the jury members were brought in, the trial court first instructed them regarding felony murder and the lesser-included charges of reckless homicide and criminally negligent homicide, then gave them instructions on second degree murder and its lesser-included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. Defendant now objects to the trial court's failure to instruct the jury on voluntary manslaughter, aggravated assault, assault, and vehicular homicide as lesser-included offenses of both felony and second degree murder. Without conceding that the offenses are lesser-included offenses to felony murder and second degree murder, the State argues that any failure to include them in the charge to the jury constitutes harmless error, under State v. Williams, 977 S.W.2d 101 (Tenn. 1998). We agree.

-15-

The defendant in Williams was convicted of first degree premeditated murder. The trial court charged the jury with the lesser-included crimes of second degree murder and reckless homicide, but failed to charge it with voluntary manslaughter. On appeal, our supreme court concluded that, although voluntary manslaughter should have been charged as a proper lesser-included offense, the trial court's failure to do so constituted harmless error. Specifically, the court stated that "by finding Defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter." Id. at 106.

The record in this case reflects that, immediately after instructing the jury on the elements of felony murder, the trial court said:

> If you find from the proof beyond a reasonable doubt that Defendant is guilty of murder in the first degree, felony murder, you will so report and your verdict in that event will be, we, the jury find Defendant guilty of murder in the first degree.
>
> . . . .
>
> If you have a doubt as to Defendant's guilt of first degree murder as charged in the indictment then your verdict must be not guilty as to this offense. And then you shall proceed to determine his guilt or innocence of the lesser included offense of reckless homicide.

The court similarly instructed the jury with regard to the count of second degree murder:

> If you have a reasonable doubt as to Defendant's guilt of second degree murder as charged in count two of the indictment then your verdict must be not guilty as to this offense and then you shall proceed to determine his guilt or innocence of the lesser included offense of voluntary manslaughter.

Jurors are presumed to follow the instructions of the trial court. Williams, 977 S.W.2d at 106. Therefore, similarly to the supreme court in Williams, we conclude that the jury's decision to convict Defendant of first degree felony murder and second degree murder, to the exclusion of the lesser-included offenses on which it was instructed, necessarily indicates that it would not have convicted Defendant of other more remote and less serious lesser-included offenses. Consequently, any error in jury instructions was harmless. Defendant is not entitled to relief on these issues.

## V. Sufficiency of the Evidence

Defendant argues that the evidence presented at trial was insufficient for a rational trier of fact to find him guilty of first degree felony murder. Specifically, Defendant contends that, although

he was indicted for murder "during the perpetration of or attempt to perpetrate rape," no evidence was presented at trial of any rape or attempted rape of the victim. In support, he refers this Court to the fact that no sperm or semen was found. The State argues that the presence of semen was not necessary in order for the jury to find that sufficient evidence existed to prove, beyond a reasonable doubt, that Defendant either raped, or attempted to rape, the victim. The State points, inter alia, to Defendant's confession in which he stated that he thought he had raped the victim and the condition of the victim's clothing, with buttons torn off her blouse and her garments appearing as though they were forcibly removed from her body.

In considering this issue, this Court does not reweigh or reevaluate the evidence. See State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Rather, when sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App.), perm. app. denied (Tenn. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. app. denied (Tenn. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a guilty verdict because of the sufficiency of the evidence unless the facts presented at trial were insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt. See id.

Defendant was convicted of first degree felony murder, defined in Tennessee Code Annotated Section 39-13-202(a)(2) as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a)(2) (1997). The statute further provides that "[n]o culpable mental state is required . . . except the intent to commit the enumerated offenses or acts[.]" Id. § 39-13-202(b). Rape is defined as the "unlawful sexual penetration of a victim by defendant or of defendant by a victim accompanied by . . . force or coercion[.]" Id. § 39-13-503(a)(1).

The evidence presented at trial, taken in the light most favorable to the State, shows that Defendant left the bar with the victim in his Chevrolet Blazer; became angry when she refused his request for sexual intercourse; beat her with wrenches and with his hands and feet; forcibly removed

her clothes; either raped, or attempted to rape her; threw her out of his vehicle; and, intentionally drove the vehicle over her body. We conclude that this evidence was sufficient for a rational trier of fact to find Defendant guilty of first degree felony murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

### VI. Conduct of Law Enforcement Officials

Defendant argues that the totality of conduct by law enforcement officials in this case is so egregious that it "shocks the conscience" and warrants a reversal of his conviction. Specifically, Defendant contends that Detectives Burns and Harrison violated his rights by (1) continuing the first interview after Defendant had requested an attorney; (2) initiating subsequent interviews; (3) using information obtained after Defendant had requested an attorney to locate and seize the Blazer; (4) waiting almost twenty-four hours before charging Defendant with a crime; (5) coercing his confession; and (6) by Detective Burns' committing perjury at the suppression hearing.

The State argues (1) that Defendant did not make a clear and unequivocal request for an attorney during the first interview; (2) if he did, and the detectives' initiation of the second and third interviews was improper, Defendant was nevertheless not prejudiced since the State chose not to introduce these interviews at trial; (3) the detectives had already learned everything they needed to know regarding the Blazer, with the exception of the father-in-law's exact address, prior to Defendant's request for an attorney and would have inevitably obtained the address through independent sources; (4) the lapse of less than twenty-four hours from the time that Defendant was taken into custody until he was charged with murder does not constitute an unreasonable delay; (5) the fourth interview was not coerced; and (6) Detective Burns did not commit perjury at the suppression hearing.

We agree with Defendant that Detectives Burns and Harrison violated Defendant's constitutional rights when they continued questioning Defendant after he requested an attorney during the first interview and, again, by initiating the second and third interviews. The evidence does not preponderate against the trial court's finding that Defendant clearly and unequivocally asserted his right to an attorney during the first interview. Thus, the continued questioning of Defendant was improper. Further, contrary to the trial court's ruling, we find that the detectives' initiation of the second and third interviews was also improper. "[A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981). However, we also agree with the State that Defendant was not prejudiced by these violations of his constitutional rights, since the State did not introduce any of these interviews into evidence at trial. See Momon v. State, 18 S.W.3d 152, 163 (Tenn. 1999) (noting that harmless error doctrine may be applied to some constitutional violations).

We have already concluded that the evidence supports the trial court's findings that Defendant initiated the fourth interview which led to his confession and, further, that the confession

was freely and voluntarily offered after Defendant had made a valid and knowing waiver of his Fifth Amendment right to remain silent and to have counsel present. Similarly, we have also determined that the evidence seized from the Blazer was properly admitted at trial, since the detectives could have easily located the vehicle through routine police investigation.

In addition, we find no merit in Defendant's contention that the detectives subjected him to an unreasonable delay before charging him with the murder of the victim. Defendant grants that he was charged within twenty-four hours of being taken into custody for questioning, and that our supreme court has held that a judicial determination of probable cause is "prompt" if it occurs within forty-eight hours. See State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). Defendant presented no proof that the less than twenty-four-hour lapse from the time he was taken into custody until he was charged was a deliberate effort on the part of the detectives to harass or intimidate him, or to violate his constitutional rights. And, as previously discussed, Defendant's fourth statement containing his confession was not the product of police coercion and, therefore, properly admissible as evidence at trial.

Finally, we also find no merit in Defendant's allegation that Detective Burns committed perjury during the suppression hearing. At the hearing, the following exchange between Defendant's counsel and Detective Burns occurred:

> Q.  He also asked you a number of times to get him an attorney, didn't he?
>
> A.  No, sir, he did not.
>
> Q.  He never asked you to get an attorney?
>
> A.  No, sir, he did not.

Our review of the tapes and the transcripts reveals that the only time Defendant mentioned an attorney was approximately forty-five minutes into the first interview when he said something that resembled, "Y'all got something on me, I want to get me a lawyer" or "Ya'll got something on me, I'm going to get me a lawyer." Even if Defendant had said "I want to get me a lawyer," rather than "I'm going to get me a lawyer," and Detective Burns interpreted his words as "want to" rather than "going to," it is clear that he never directly asked Detective Burns to get him an attorney. Therefore, Detective Burns did not commit perjury when he testified that Defendant never asked him to get him a lawyer.

In sum, although we agree that the detectives violated Defendant's rights by continuing the first interview after he had asserted his right to an attorney and also by improperly initiating the second and third interviews, we conclude that Defendant was not prejudiced by these violations of his right to counsel since the State chose not to introduce the interviews at trial. Furthermore, we find no merit in Defendant's other allegations of misconduct on the part of the detectives. In sum,

our review of the record revealed no egregious behavior on the part of the detectives or deliberate and concerted efforts to violate Defendant's rights such as would be necessary to "shock the conscience" and warrant a reversal of his conviction. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the above reasons, we AFFIRM the judgment of the trial court.

_____

THOMAS T. WOODALL, JUDGE